IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                  Cr. No. 18-2045 KG

BRANNON SHELTON,

     Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on Defendant's Motion to Suppress Evidence and Statements ("Motion"), filed August 23, 2018. (Doc. 26). The United States responded on September 11, 2018. (Doc. 31). Defendant replied on September 25, 2018. (Doc. 32). On October 9, 2018, the Court held an evidentiary hearing on the Motion. Assistant United States Attorney Mark Saltman appeared for the United States, and Assistant Federal Public Defenders Jane Greek and Megan McLoughlin appeared on behalf of Defendant Brannon Shelton, who was present. Having considered the briefing, the oral arguments of counsel, the applicable law and the evidence, the Court **DENIES** the Motion.

I.    *Procedural Background*

On February 23, 2018, the United States charged Defendant with violating 18 U.S.C. §§ 922(g)(1) and 924(e)(1), for allegedly possessing a firearm after being convicted of a felony. (Doc. 1) at 1. On June 20, 2018, Defendant was indicted for allegedly violating 18 U.S.C. § 922(g)(1) by knowingly possessing a firearm and ammunition after having been convicted of felony crimes. (Doc. 16). The evidence adduced at the evidentiary hearing on Defendant's Motion included testimony from Roswell Police Department ("RPD") Officer Johnny Estrada, RPD Sergeant Ryan Craine, RPD Sergeant Jeffrey Prince, Penny Cherry, Federal Public

1

Defender Investigator Gilbert Apodaca, and Chaves County Detention Officer Gabriel Mauldin, who testified telephonically.[1]  The evidence also included United States' Exhibits 1 through 3 and 5 through 15, all admitted without objection.[2]  Tr. at 31.[3]  Exhibit 1 is an audio/video recording from Officer Estrada's lapel camera.

II.      *Findings of Fact*

On January 4, 2018, Estrada was on patrol during the 4:00 p.m. to 2:00 a.m. shift.  Tr. at 17.  He was wearing his duty uniform, displaying his badge of office, and driving a marked patrol car.  Tr. at 17-18.  At the time, Estrada had been working for the RPD for approximately 10 months.  Tr. at 13, 63, 77.  His duties included patrolling designated areas in Roswell.  Tr. at 13-14.

At 11:58 p.m., Estrada was traveling northbound on South Richardson Avenue when he looked over at West Tilden Street.  *Id.*  Estrada observed several subjects standing around a vehicle with what appeared to be flashlights, looking through the vehicle while one of the doors was open.  *Id.*  The vehicle, a blue Saturn, was parked in the driveway of 205 West Tilden.  *Id.*; (Doc. 26-1), at 1.

Based on these observations, Estrada suspected there was a vehicle burglary in progress.  Tr. at 18.  Moreover, this address is located in a residential area with heavy foot traffic and is a high crime area.  *Id.*  Crimes that have occurred in that neighborhood include property crimes, shootings, and vehicle burglaries, among others.  Tr. at 19.  Estrada estimated he had

---

[1] The Court granted Defendant's Motion for Witness (Mauldin) to Appear Telephonically.  (Doc. 42).

[2] The United States opted not to offer Exhibit 4.  Tr. at 31.

[3] The Court's citation to the hearing transcript refers to the court reporter's original unedited version.  Any final transcript may contain slightly different page and/or line numbers.

investigated five vehicle burglary cases before January 4, 2018. Tr. at 63. Estrada testified that vehicle burglaries commonly occur at night in driveways and involve the use of flashlights. Tr. at 15-16.

As a result, Estrada turned his vehicle around on Richardson and drove to West Tilden. Tr. at 19. Estrada reported to dispatch he would be out with three subjects. Tr. at 68. Approximately 15 to 25 seconds elapsed from the time he first observed the subjects until he arrived at 205 West Tilden. Tr. at 19. Estrada parked his car on the street at the entrance of the driveway and behind the Saturn, positioning his car to shine his spotlight on the Saturn in the driveway. Tr. at 19-20. The driveway was open and accessible to Estrada. Tr. at 26. Estrada did not see any lights inside the Saturn, and he noticed that all of the car doors were closed. Tr. at 20. He also noted that the subjects no longer were visible outside the Saturn, suspecting they were attempting to conceal themselves inside the vehicle. Tr. at 20. He further noticed the Saturn's headlights and tail lights were on, indicating the subjects may have been attempting to burglarize or steal the vehicle. Tr. at 21. Estrada additionally noticed that the light on the exterior of the house at the porch was lit. Tr. at 22. That did not dispel his suspicion that a burglary was occurring because vehicle burglaries are a crime of opportunity that occur regardless of the time of day or whether the area is illuminated. *Id.*

Estrada activated his emergency lights and exited his patrol car. *Id.* As he stepped out of his vehicle and started walking toward the driveway, he observed the subjects get out of the Saturn, including Defendant, who had been in the driver's seat. Tr. at 22-24. All three subjects walked away from Estrada and toward the backyard of 205 West Tilden. Tr. at 23. Estrada suspected that the subjects were attempting to flee. Tr. at 24.

As a result, Estrada twice shouted at the subjects to stop, commanding, "Come here!" *Id.*

When the subjects refused to stop and continued to walk away, Estrada became certain that he

had happened upon a vehicle burglary, a felony offense in New Mexico. Tr. 25, 27.

Consequently, he continued his approach onto the driveway and toward the subjects as they

walked away. Tr. at 25.

Estrada then observed one subject, Defendant, and a second male, identified as Thomas

Dellavecchio, begin to run toward the backyard. Tr. at 26. As a result, Estrada gave chase. *Id.*

The third subject, later identified as Lynette Burrell, and Dellavecchio stopped when Estrada

started to pursue them. Tr. at 26-27. Estrada continued to pursue Defendant, ordering Burrell

and Dellavecchio to remain where they were. Tr. at 27.

Estrada ran into the backyard, initially losing sight of Defendant. *Id.* Defendant then ran

toward and into Estrada. *Id.* Estrada commanded Defendant to stop and to get on the ground,

briefly grabbing Defendant when he ran into Estrada. *Id.* Defendant then pushed Estrada away

and ran into an adjacent yard, where he hid underneath a travel trailer until Estrada located him

there. Tr. at 28-29. Defendant had a flash light in his hands when he came out from underneath

the trailer. Tr. at 30. The entire chase lasted approximately one minute. Tr. at 29.

Estrada arrested Defendant for resisting or evading arrest, and for battery on a police

officer. *Id.* Estrada handcuffed Defendant and placed him in Estrada's patrol car. *Id.* When

Estrada asked Defendant who owned the Saturn, Defendant responded that he did not know. Tr.

at 30. Estrada then advised Defendant of his *Miranda* warnings. Tr. at 39. Without prompting

from Estrada, Defendant stated that anything found in the vehicle did not belong to him. *Id.*

Estrada testified this statement was significant to him because, "When [subjects] try to separate

themselves or not claim ownership of an object, it's usually because there's something they don't want to get in trouble for." *Id.*

Meanwhile, at approximately 11:58 p.m., Sergeant Craine responded to the scene because he heard Estrada advising officers that multiple suspects were fleeing from him. Tr. at 90. Craine located Dellavecchio walking down West Tilden and arrested him for failing to obey Estrada's command to remain at 205 West Tilden. Tr. at 39-40, 90-92. Craine searched Dellavecchio and found an uncapped syringe in his pocket. Tr. at 91. Dellavecchio stated he forgot he had the syringe and told Craine he was "just a user." *Id.* Dellavecchio did not make any statements about the Saturn, but stated he was just trying to get a ride. *Id.*

Estrada arranged for the Saturn to be towed to the Roswell Police Department so a search warrant could be obtained. Tr. at 40. Before the Saturn was towed, the engine was running and the doors were not locked. Tr. at 56. Estrada was not able to make contact with the registered owner, further suspecting a vehicle burglary. Tr. at 41. Estrada also could not find anyone at 205 West Tilden to claim the vehicle. Tr. at 56. Estrada requested a warrant to search for "any drug paraphernalia, any illegal narcotics, any proof of ownership, proof of occupancy, any burglary tools (i.e., flashlights, gloves, entry tools)." Tr. at 45. The warrant was approved on January 8, 2018, by a Chaves County magistrate judge, and Estrada executed it the same day. Tr. at 43-46.

Estrada found drug paraphernalia inside the Saturn, as well as a backpack, which was on the front passenger floor board. Tr. at 47, 52. The backpack contained a wallet with Defendant's identification, a firearm, drug paraphernalia, and a white crystalline substance. *Id.* After discovering that Defendant has a felony conviction in his record, Estrada sought and

obtained an amended search warrant on January 11, 2018, to include a search for a firearm. Tr. at 48. Estrada executed the amended warrant the same day and seized the firearm. Tr. at 49-52.

At the hearing, Defendant offered testimony from Penny Cherry, who said she had dated Defendant for approximately one year, including a period from October 2017 until January 2018. Tr. at 120, 122-23. She also said their relationship was off and on until his arrest on January 5, 2018. *Id.* Cherry testified Defendant had lived at 205 West Tilden for approximately three months prior to his arrest. Tr. at 121, 123. She stated Defendant had a female roommate at 205 West Tilden, but Cherry did not remember her name. Tr. at 122. The last time Cherry spent the night at 205 West Tilden was between Christmas 2017 and New Year's Day 2018, and at that time Defendant had his own bedroom in which he kept all of his possessions. Tr. at 125. Cherry said she picked up Defendant's belongings at 205 West Tilden after his arrest. Tr. at 122.

Defendant also offered testimony from Officer Mauldin, a county detention officer, who testified that he remembered booking Defendant into the detention center on January 5, 2018. Tr. at 141. Mauldin stated that 205 West Tilden "does ring a bell in my head" with respect to whether law enforcement records listed that address as Defendant's address, although he did not remember specifically how he obtained Defendant's address. *Id.*; (Doc. 32-1) at 1. The booking sheet identified Defendant's address as 205 Tilden. (Doc. 32-1) at 1. Mauldin testified that he has never put any information on a booking sheet that he believed to be false, and that he follows up with the person being booked about their contact information. Tr. at 139. Mauldin typically has a "hunch" when an inmate is lying about his or her address. Tr. at 143-44. Mauldin acknowledged inmates have an incentive to lie about their personal information when they are being booked, including their address. *Id.*

Sergeant Prince testified he cleared the home at 205 West Tilden after Estrada arrested Defendant.  Tr. at 109-10.  He knocked on the front door at 205 West Tilden to find out whether the homeowner knew about the Saturn or knew Defendant, Dellavecchio, or Burrell.  Tr. at 109.  No one answered the door, so Prince entered the home through a partially open side door.  *Id.*  He did not find anyone inside, nor did he observe any evidence Defendant lived in the home, though he conceded he was not searching for such evidence.  Tr. at 110.  Prince also checked the travel trailer parked in the backyard.  *Id.*  A man identified as Mike Chips answered the door of the travel trailer.  Tr. at 110-11.  When asked, Chips stated someone named "Valerie" lived at 205 West Tilden, and he did not mention Defendant as a resident of that home.  Tr. at 111.  Prince conceded he did not ask Chips if he was aware whether Valerie had rented a room to anyone.  Tr. at 115.

III.    *Analysis*

Defendant argues that his initial detention in the driveway was unreasonable, and that Estrada acted without reasonable suspicion or probable cause.  (Doc. 26) at 5-6.  Further, Defendant asserts that Estrada's search of the curtilage at 205 West Tilden without a warrant was unlawful, and that the RPD acted unlawfully by impounding the Saturn.  *Id.* at 6-16.  The United States responds that Estrada had reasonable suspicion to detain Defendant, which then ripened into probable cause to arrest him.  (Doc. 31) at 5-13.  The United States also contends that Defendant lacks standing to challenge Estrada's search of the curtilage at 205 West Tilden and Estrada's search and seizure of the Saturn.  *Id.* at 13-17.  The United States argues that Estrada's hot pursuit of Defendant justified his entry into the backyard, and that RPD's impoundment of the Saturn was proper because there was probable cause to search the vehicle.  *Id.* at 17-21.  Finally, the United States asserts that Estrada should benefit from the *Leon* good-faith exception

if the Court concludes that the search warrants were not supported by probable cause.  *Id.* at 21-23.

"The purpose of a suppression hearing is 'to determine preliminarily the admissibility of certain evidence allegedly obtained in violation of defendant's rights under the Fourth [ ] Amendment[ ].'"  *United States v. Maurek*, 131 F. Supp. 3d 1258, 1261-1262 (W.D. Okla. 2015) (quoting *United States v. Merritt*, 695 F.2d 1263, 1269 (10th Cir. 1982)).  "The proper inquiry is whether the challenged action violated the Fourth Amendment rights of the criminal defendant making the challenge."  *United States v. Allen*, 235 F.3d 482, 489 (10th Cir. 2000) (alteration omitted) (quoting *United States v. Erwin*, 875 F.2d 268, 270 (10th Cir. 1989)).  "The proponent of a motion to suppress has the burden of adducing facts at the suppression hearing indicating that his own rights were violated by the challenged [action]."  *United States v. Eckhart*, 569 F.3d 1263, 1274 (10th Cir. 2009) (quoting *Allen*, 235 F.3d at 489).  In the context of an allegedly unlawful search or seizure, the United States bears the burden of "proving the reasonableness of the officer's suspicion."  *United States v. Hernandez*, 847 F.3d 1257, 1263 (10th Cir. 2017) (quoting *United States v. Simpson*, 609 F.3d 1140, 1146 (10th Cir. 2010)).  Finally, the Court views the evidence in the light most favorable to the United States.  *See, e.g., United States v. Turner*, 2013 WL 5727404, at *9 (D. Kan.) ("While the Court is cognizant that it must view the facts in the light most favorable to the Government, it may not draw inferences that are not supported by the record, nor accept facts that are contrary to the record."); *United States v. Ortega*, 2012 WL 12894242, at *4 (S.D. Fla.) ("viewing the facts adduced at the suppression hearing in the light most favorable to the government").

   A.      *Defendant was Not Seized in Violation of the Fourth Amendment*

Defendant argues that he was unlawfully seized when Estrada parked his patrol car behind the Saturn, thereby blocking the driveway. (Doc. 26) at 6. He also argues that he was unlawfully seized when Estrada grabbed his jacket in the backyard during the foot chase. *Id.* at 5-6. The United States concedes Defendant was likely seized when Estrada grabbed Defendant's jacket. (Doc. 31) at 9-10. The United States asserts, however, that Estrada's efforts to detain Defendant were justified by reasonable suspicion and, prior to Defendant's arrest, were simply an attempted seizure. *Id.* at 10.

### 1. Defendant Was Seized When He Was Arrested

As an initial matter, the Court must decide where and when Defendant was seized. It is well established that not every encounter between law enforcement and a citizen is a seizure. *Fla. v. Bostick*, 501 U.S. 429, 434 (1991) (stating, "Our cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required.") (internal citations and quotations omitted). A seizure, for the purposes of the Fourth Amendment, has occurred "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). The reasonable person standard is objective and contemplates what "the reasonable man's interpretation of the conduct in question" would be. *Chesternut*, 486 U.S. at 574.

"When an officer does not apply physical force to restrain a suspect, a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the citizen submits

to the assertion of authority." *United States v. Salazar*, 609 F.3d 1059, 1064 (10th Cir. 2010)

(internal quotation marks, citations, and alteration omitted). *Salazar* continued:

> In particular, the test for existence of a show of authority is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person. The question of whether the suspect submitted to that authority is also an objective one. . . . In determining whether particular conduct constitutes submission to authority, we must examine the totality of the circumstances - the whole picture.

*Id.* at 1064 (internal quotation marks, citations, and alteration omitted). "Because the standard is

an objective one, we consider whether a citizen has submitted to authority by examining the view

of a reasonable law enforcement officer under the circumstances." *Id.* at 1065 (internal citation

omitted). The Tenth Circuit has "characterized that reasonable officer as prudent, cautious, and

trained." *Id.* (internal quotation marks and citation omitted).

This Court cannot conclude Defendant was seized when Estrada parked his unit on the

street blocking the driveway. Insofar as Defendant relies on *United States v. Olivares-Rangel*,

324 F.Supp.2d 1218 (D.N.M. 2004) *(aff'd and rev'd on other grounds by United States v.

Olivares-Rangel*, 458 F.3d 1104 (10th Cir. 2006)), to argue that Estrada seized him when he

blocked the driveway with his patrol vehicle, the Court concludes that *Olivares-Rangel* is

distinguishable. Estrada parked his unit on the street at the driveway; Defendant was in the

driver's seat at the time; the vehicle was running; and the head and tail lights were on. Tr. at 21-

24, 56. However, unlike the vehicle in *Olivares-Rangel*, there is no evidence that sufficiently

indicates Defendant was driving out of the driveway, albeit in reverse. *See* 324 F.Supp.2d at

1221-22 (describing vehicle "attempting to leave" trailer park when agents "simply pulled in

front of, and thereby blocked the exit of, the pick-up in which Mr. Olivares-Rangel was

riding[,]" which constituted seizure for Fourth Amendment purposes). Estrada did not stop the

Saturn when he blocked the driveway because there is no evidence the Saturn was reversing out of the driveway. As a result, this Court is not persuaded Defendant was seized at the moment Estrada parked his unit at the driveway. *See United States v. Roberson*, 864 F.3d 1118, 1124 (10th Cir. 2017), *cert. denied*, 138 S.Ct. 2649 (2018) (holding officers did not seize defendant while he was inside parked vehicle by shining bright light on vehicle and walking towards it, which was show of authority, because defendant did not submit); *United States v. Madden*, 682 F.3d 920, 925 (10th Cir. 2012) (holding no seizure where officer approached parked vehicle, asked driver what he was doing, and requested his driver's license because officer did not convey compliance with requests was required).

In view of the evidence, including Exhibit 1, which is Estrada's lapel camera video of the incident [Tr. at 31-32], the Court concludes Defendant failed to submit to Estrada's show of authority. Specifically, Defendant, Burrell, and Dellavecchio all exited the Saturn just as Estrada pulled up behind them in his marked patrol car. Tr. at 23. He turned on his emergency lights, exited his patrol car, walked toward the driveway, and upon seeing the subjects walk away, ordered them twice, "Come here!" Tr. at 23-25. Although Dellavecchio and Burrell stopped at the gate to the backyard, Defendant fled. Tr. at 26-27. Defendant did not submit to Estrada until he crawled out from under the travel trailer in the backyard next door, at which point he was seized.

2.     *Defendant's Seizure was Justified as an Investigatory Detention by Reasonable Suspicion*

The Fourth Amendment guarantees individuals the right to be free from unreasonable searches and seizures of their person and property. U.S. Const., amend. IV. Investigatory detentions, or "swift action predicated upon the on-the-spot observations of the officer on the beat," must be justified by "specific and articulable facts which, taken together with rational

inferences from those facts, reasonably warrant that intrusion[.]" *Terry v. Ohio*, 392 U.S. 1, 20-21 (1968). Generally, searches and seizures are justified if "the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate[.]" *Id.* at 21-22 (internal quotation marks and citation omitted). "And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Id.* at 27 (internal citation omitted).

The reasonableness inquiry is determined by considering (1) "whether the officer's action was justified at its inception," and (2) "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 19-20. The Court looks to the totality of the circumstances, "rather than assessing each factor or piece of evidence in isolation." *United States v. McHugh*, 639 F.3d 1250, 1256 (10th Cir. 2011). The Court also "defer[s] to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." *Id.* (internal citation omitted). Relevant factors for analyzing reasonable suspicion for an investigatory detention, otherwise known as a *Terry* stop, include whether the investigatory detention occurred in a high crime area and whether it occurred late at night. *Id.* at 1257.

Estrada's observations, taken together, would warrant a person of reasonable caution to further investigate. *See Terry*, 392 U.S. at 21-22. Specifically, Estrada suspected that an auto burglary, which he knew to be a felony offense, was in progress in the driveway of 205 West Tilden. Tr. at 18. His initial suspicion was based on the following observations: (1) several subjects were standing around a vehicle; (2) several subjects appeared to be looking through the

vehicle with flashlights; (3) the vehicle doors were open; (4) 205 West Tilden is located in a high crime area; and (5) the activity was late at night. *Id.* As a result, Estrada turned his patrol vehicle around and drove to the residence. Tr. at 19. Within seconds, Estrada arrived at 205 West Tilden. *Id.* He positioned his vehicle to shine his spot light into the driveway, observed the subjects no longer were visible; the Saturn doors were closed, the vehicle headlights and tail lights were on; and no lights were visible inside the vehicle. Tr. at 19-20. Estrada next observed the subjects get out of the vehicle and walk away. Tr. at 22.

The Court acknowledges that Estrada continued to drive on Richardson before turning around to proceed to West Tilden. Tr. at 67. The Court also considers the time that elapsed before Estrada arrived at 205 West Tilden, that he did not report to dispatch a possible auto burglary in progress, though he reported observing three subjects, and that the light on the exterior of the residence was on. Tr. at 19, 22, 68. Nonetheless, viewing this evidence in totality and in the light most favorable to the United States, the Court concludes Estrada's suspicion that an auto burglary was in progress was reasonable. Accordingly, Estrada's attempt to detain Defendant to investigate the auto burglary was justified. Estrada's reasonable suspicion ripened into probable cause that Defendant had committed an auto burglary based on Defendant's flight. *See United States v. Charles*, 576 F.3d 1060, 1065 (10th Cir. 2009) (holding officer's reasonable suspicion ripened into probable cause when officer ran into defendant racing up stairs at apartment building late at night in high-crime area, and defendant subsequently fled).

B.      *Defendant Has Standing to Challenge Estrada's Search of 205 West Tilden*

The United States contends Defendant does not have proper standing to challenge Estrada's "entry onto the curtilage of the house at 205 West Tilden." (Doc. 31) at 13. The United States asserts that Defendant failed in his Motion "to state who lives at the house or what

business, if any, he had at the house." *Id.* Because there was no evidence that Defendant, Burrell, or Dellavecchio lived at 205 West Tilden, or that Defendant "was a guest at the house or otherwise had lawful permission to be at the house[,]" Defendant failed to establish standing to challenge Estrada's entry onto the curtilage. *Id.* at 14. In reply, Defendant argues that he "had been renting a room at 205 West Tilden Street, Roswell, New Mexico, and indeed lived there for about three months leading up to his arrest[.]" (Doc. 32) at 4. Defendant maintains that he "provided 205 West Tilden as his residential address when booked into the Chaves County Detention Center upon his arrest." *Id.*; (Doc. 32-1) at 1.

In general, standing is determined by "the classic Fourth Amendment test: whether the individual manifested a subjective expectation of privacy in the area searched and whether society is prepared to recognize that expectation as objectively reasonable." *United States v. Valdez Hocker*, 333 F.3d 1206, 1208–09 (10th Cir. 2003) (internal quotation marks, alteration, and citations omitted). "The Fourth Amendment protects a house's curtilage, that is, the 'area immediately surrounding the home.'" *United States v. McDowell*, 713 F.3d 571, 574 (10th Cir. 2013) (quoting *Oliver v. United States*, 466 U.S. 170, 178 (1984)).

Curtilage "is protected as part of the home itself[,]" thus Defendant's standing to challenge Estrada's search of the curtilage at 205 West Tilden then turns on whether Defendant manifested a subjective expectation of privacy in 205 West Tilden, and whether that expectation was objectively reasonable. *United States v. Dupree*, 540 F. App'x. 884, 890 (10th Cir. 2014) (unpublished). "The burden of proof is on the defendant to demonstrate that he has a reasonable expectation of privacy in the place searched to establish his standing." *United States v. Johnson*, 584 F.3d 995, 998 (10th Cir. 2009).

Evidence adduced at the suppression hearing indicated that Defendant lived at 205 West Tilden, and thus manifested a subjective expectation of privacy in 205 West Tilden that was objectively reasonable. Cherry testified that Defendant lived at 205 West Tilden and kept his belongings there, which indicates that he had a subjective expectation of privacy in the residence. Tr. at 121, 123, 125. Additionally, this expectation of privacy is objectively reasonable. *See Kyllo v. United States*, 533 U.S. 27, 34 (2001) ("[I]n the case of the search of the interior of homes – the prototypical and hence most commonly litigated area of protected privacy – there is a ready criterion, with roots deep in the common law, of the minimal expectation of privacy that *exists*, and that is acknowledged to be *reasonable*."). Cherry's testimony was not sufficiently rebutted. The Court notes Ms. Cherry's potential for bias and motive to testify favorably for Defendant, and so the Court harbors some reservations as to her veracity. Even so, the Court accepts her testimony that Defendant lived at 205 West Tilden.

Mauldin testified that when he booked Defendant, he included the 205 West Tilden address on Defendant's booking sheet, and that he typically follows up with the person being booked about their contact information. Tr. at 139-141. Mauldin also testified that he typically knows when an inmate is lying about his or her address, although he admitted that inmates have an incentive to lie about their personal information when they are being booked. Tr. at 143-44. However, Mauldin could not recall with sufficient reliability that the 205 West Tilden address that he specified in Defendant's booking forms came directly from Defendant. Tr. at 141-42. As a result, his testimony is not reliable. Nevertheless, viewing the totality of evidence, the Court concludes (1) Defendant presented unrebutted evidence that he lived at 205 West Tilden; and (2) Defendant manifested a subjective expectation of privacy in 205 West Tilden, which was

objectively reasonable because he lived there.  *See Kyllo*, 533 U.S. at 34.  Defendant has therefore met his burden to establish standing to challenge Estrada's search of 205 West Tilden.

C.       *205 West Tilden Was Lawfully Searched*

Defendant asserts that Estrada unlawfully searched the driveway, sideyard, and backyard of 205 West Tilden, which he contends are all curtilage, because he did not have reasonable suspicion or probable cause to do so.  (Doc. 26) at 6-7.  Defendant also argues that there were no exigent circumstances justifying Estrada's warrantless entry into the curtilage.  *Id.* at 7.  The United States responds that the driveway was not curtilage, and that although the backyard was curtilage, Estrada entered in hot pursuit of Defendant, which justified Estrada's warrantless entry.  (Doc. 31) at 16-17.

"The Supreme Court has articulated four factors to determine whether an area is within the curtilage: (1) the proximity of the area to the house; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the use to which the area is put; and (4) the steps taken by the resident to protect the area from observation."  *McDowell*, 713 F.3d at 574 (citing *United States v. Dunn*, 480 U.S. 294, 301 (1987)).  "The central inquiry is whether the area in question is so intimately tied to the home itself that it should be placed under the home's umbrella of Fourth Amendment protection."  *Id.* (internal quotation marks and citation omitted).

Viewing the evidence in the light most favorable to the United States and considering the arguments by counsel, the Court agrees with the United States that the driveway is not curtilage. Although the driveway is in somewhat close proximity to the house, the evidence and Estrada's testimony indicate the driveway was open and readily accessible, that Estrada did not have to go through a gate to walk up the driveway, there were no trees near the driveway, that Estrada's access to the driveway was not limited in any way, and finally that the driveway was not shielded

from public view. Tr. at 25-26. There is no evidence that the residents of 205 West Tilden used the driveway for anything other than parking vehicles. For these reasons, the Court finds that the driveway is not curtilage. *See McDowell*, 713 F.3d at 574 (stating factor in determining whether area is curtilage is "nature of the use to which the area is put").

Defendant argues the sideyard of 205 West Tilden is curtilage, but he does not argue a search or seizure occurred in that area of the property. (Doc. 26) at 7. Defendant argues only that a seizure occurred in the driveway when Estrada blocked the Saturn and that Estrada seized Defendant when he grabbed him in the backyard. *See id.* at 5-6. Because Defendant does not argue that a search or seizure occurred in the side area leading into the backyard, it is not necessary for the Court to determine whether that area is curtilage.

The Court agrees with Defendant and the United States that the backyard at 205 West Tilden is curtilage. *See* (Doc. 26) at 7; (Doc. 31) at 17. It is immediately adjacent to the home, it is enclosed behind a gate, and it is not visible from the driveway. *See McDowell*, 713 F.3d at 574 (stating these factors are relevant to whether area is curtilage). Because the backyard at 205 West Tilden is curtilage, it is treated as an extension of the home itself for Fourth Amendment purposes. *See id.*; *Dupree*, 540 F. App'x. at 890. Estrada, therefore, required either a search warrant before entering the backyard, or there must have been exigent circumstances justifying his warrantless entry, such as hot pursuit of a defendant. *See United States v. Thomas*, 372 F.3d 1173, 1177 (10th Cir. 2004) (police must have either search warrant or exigent circumstances to enter home, and hot pursuit of fleeing felon is exigent circumstance) (*modified in part on other grounds by Brigham City, Utah v. Stuart*, 547 U.S. 398, 404-05 (2006)).

If a defendant "seeks to avoid arrest by retreating into a home, an officer may enter to complete the arrest when in 'hot pursuit.'" *Gutierrez v. Cobos*, 2015 WL 13239104, at *6

(D.N.M.) (citing *United States v. Santana*, 427 U.S. 38, 42 (1976)), *aff'd*, 841 F.3d 895 (10th Cir. 2016); *see also United States v. Johnson*, 333 U.S. 10, 16 n. 7 (suggesting that hot pursuit requires pursuit of defendant "in flight"). "[A] suspect may not defeat an arrest which has been set in motion in a public place . . . by the expedient of escaping to a private place." *Santana*, 427 U.S. at 43. "There must be immediate or continuous pursuit from the scene of a crime." *Gutierrez*, 2015 WL 13239104, at *6 (citing *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984)). An officer has the "heavy" burden of demonstrating exigent circumstances that required hot pursuit. *See United States v. Mongold*, 528 F. App'x 944, 948 (10th Cir. 2013) (citing *United States v. Najar*, 451 F.3d 710, 717 (10th Cir. 2006)).

The Court concludes Estrada was justified to pursue Defendant in and through the backyard of 205 West Tilden. Estrada reasonably suspected the Saturn was being burglarized, which is a felony; he stopped his patrol car, got out and proceeded to investigate; and he observed subjects open the car doors and get out. Tr. at 21-23. When all three subjects refused his commands and began to flee, Estrada pursued them through the front yard to a gate, then pursued Defendant into the backyard and into the yard next door where he arrested Defendant. Tr. at 27. Because Estrada entered the backyard at 205 West Tilden and had to "act quickly" to prevent Defendant from escaping what Estrada believed to be the commission of a felony, the Court concludes Estrada was justified to pursue Defendant into 205 West Tilden without a warrant. *Santana*, 427 U.S. at 42 (holding suspect "may not defeat arrest which has been set in motion in a public place . . . by the expedient of escaping to a private place").

D.      *The Saturn Was Lawfully Seized and Searched.*

1.      *Defendant Has Standing to Challenge Estrada's Seizure and Search of the Saturn*

The United States asserts that Defendant does not have standing to challenge Estrada's seizure and search of the Saturn because "he abandoned it when he ran to avoid questioning and disclaimed lawful possession of it." (Doc. 31) at 17-18. Defendant argues that because he left the vehicle in the driveway at his own home, as opposed to a public place, he did not abandon it. (Doc. 32) at 13. Defendant additionally argues that his statement to Estrada that he did not know who owned the Saturn was not an explicit disclaiming of his lawful possession of the vehicle. *Id.* at 15. Finally, Defendant asserts that even if the Court finds that Defendant abandoned the vehicle, that abandonment was involuntary "because it resulted from Officer Estrada's unlawful seizure of the Saturn and Mr. Shelton." *Id.*

It is Defendant's burden to establish standing with respect to the Saturn:

> [T]he defendant bears the burden of showing that he had a legitimate possessory interest in or a lawful control over the car. Because the focus of the inquiry is on reasonable expectations, however, a defendant need not submit legal documentation showing a chain of lawful custody from the registered owner to himself. In resolving standing issues of this type, we consider important, but not determinative, the following factors: (1) whether the defendant asserted ownership over the items seized from the vehicle; (2) whether the defendant testified to his expectation of privacy at the suppression hearing; and (3) whether the defendant presented any testimony at the suppression hearing that he had a legitimate possessory interest in the vehicle. . . . Where the proponent of a motion to suppress is the car's driver but not the registered owner, mere possession of the car and its keys does not suffice to establish a legitimate possessory interest. Rather, at a minimum, the proponent bears the burden of establishing that he gained possession from the owner or someone with authority to grant possession.

*Valdez-Hocker*, 333 F.3d at 1209 (internal quotation marks, alteration, and citations omitted).

Viewing the evidence, the Court finds that Defendant has standing to challenge the search of the Saturn. The parties do not dispute that the registered owner of the Saturn was Cecilia Martinez, with an address in Rio Rancho, New Mexico. Tr. at 38. After two attempts to make contact, Estrada finally spoke to Martinez on January 14, 2018. According to Estrada, Martinez stated she gave Defendant permission to take the Saturn so he could work on it for her. Tr. at 53.

The RPD released the Saturn to Martinez on January 15, 2018. Tr. at 54. The Court notes Defendant said he initially told Estrada he did not know who owned the vehicle. Nevertheless, in view of the evidence, including Martinez's explanation to Estrada, which itself is unrebutted, the Court concludes Defendant had a legitimate possessory interest in the Saturn. *Valdez-Hocker*, 333 F.3d at 1209 ("[T]he proponent [of standing] bears the burden of establishing that he gained possession from the owner or someone with authority to grant possession.") (internal quotation marks and citation omitted). Accordingly, Defendant had a reasonable expectation of privacy in the Saturn, and the Court concludes that Defendant has standing to challenge the search of the Saturn.[4] *See id.* at 1211 (holding defendant with lawful permission to possess vehicle had reasonable expectation of privacy in vehicle).

### 2.     *Estrada Had Probable Cause to Seize and Search the Saturn*

Having concluded Defendant has standing to challenge the search and seizure of the Saturn, the Court now addresses their legality. Defendant asserts that there was no probable cause for the impoundment of the Saturn because there was no probable cause for his arrest. (Doc. 26) at 7. Defendant does not directly argue that there was no probable cause for the search warrant. Nevertheless, the Court interprets Defendant's argument as a challenge to the search warrants. The search of the Saturn was authorized by the search warrants Estrada obtained, and the Saturn was seized so Estrada could obtain search warrants. Tr. at 40. The Court finds that probable cause supported both search warrants.

---

[4] Because the Court finds that Defendant has standing to challenge the search of the Saturn, the Court need not address the United States's argument that Defendant abandoned the Saturn and thus lacked standing to challenge the search of the Saturn on that basis. *See* (Doc. 31) at 17-19.

"An affidavit establishes probable cause for a search warrant if the totality of the information it contains establishes the fair probability that contraband or evidence of a crime will be found in a particular place.  Whether probable cause exists in a given case is a flexible, common-sense standard, and no single factor or factors is dispositive."  *United States v. Knox*, 883 F.3d 1262, 1275 (10th Cir.), *cert. denied*, No. 17-9593, 2018 WL 3159943 (U.S. Oct. 1, 2018) (internal quotation marks and citations omitted).

Information in the search warrant affidavits constituted probable cause.  First, Estrada wrote in the first affidavit that Defendant made an unsolicited statement following his arrest that nothing in the car was his.  Tr. at 39; (Doc. 26-3) at 4.  Second, according to the affidavit, Craine found an uncapped syringe on Dellavecchio, who had been in the Saturn with Defendant at the beginning of this incident.  Tr. at 91; (Doc. 26-3) at 4.  Third, Estrada, considering the totality of the situation, believed that an auto burglary had occurred because of his observations and because Defendant told him that anything found in the car did not belong to him.  (Doc. 26-3) at 4.  The first search warrant requested permission to search the Saturn for drug paraphernalia, illegal narcotics, proof of ownership of the Saturn, proof of occupancy of the Saturn, and burglary tools.  (Doc. 26-3) at 3.  Estrada had probable cause to search for each of these items because he believed an auto burglary had occurred and an occupant of the vehicle was arrested with drug paraphernalia.  For these reasons, probable cause supported the first search warrant and supported Estrada's impound of the vehicle.[5]  Probable cause also supported the second

---

[5] The United States argues generally that if somehow the Court found the search warrant lacked probable cause, the seizure of evidence nonetheless was lawful, relying on *United States v. Leon*, 468 U.S. 897 (1984) (describing good faith exception to exclusionary rule).  (Doc. 31) at 21-23. *Leon* provides that courts should consider the following factors to determine whether the good faith exception applies: whether the search warrant's affidavit was based on "knowing or reckless falsity;" whether the approving judge performed his "neutral and detached function" and did not "serve merely as a rubber stamp for the police;" whether the affidavit provided the

search warrant, which was amended to refer to the firearm Estrada found in the vehicle while he was executing the first search warrant. [6]  *See* Tr. at 47-51.

### 3.     *Estrada Properly Impounded the Saturn*

Defendant argues RPD violated its own policy when it impounded the Saturn and, moreover, the impoundment was not supported by probable cause.  (Doc. 26) at 14-15. Defendant contends he "was never given the opportunity to have a responsible party come take control of the [Saturn]."  *Id*. at 15.  Additionally, because the search warrant was executed more than 72 hours after the Saturn was towed, the Saturn was held in violation of Roswell Police Department's policy that a vehicle should be automatically released after 72 hours.  *Id.* Defendant also contends the car "was towed merely as a fishing expedition" because "the car contained no evidence known to the Roswell Police Department at the time it was towed."  *Id.* at 14-15.

---

approving judge "with a substantial basis for determining the existence of probable cause;" and whether the "warrant may be so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid."  *Id.* at 914-15, 923.  As described, this Court has found the search warrant is supported by probable cause.  Nevertheless, viewing the totality of evidence and considering the applicable standard, the Court concludes Estrada relied in good faith that the search warrant was based on probable cause.

[6] The United States further argues at the hearing that "the gun would have been inevitably discovered anyway because we find the uncapped syringe on Thomas Delavecchio, which gets us into the car under the search warrant."  Tr. at 165.  In other words, the firearm would have been seized inevitably as a result of the warranted search.  Notably, the United States does not argue the formal application of the inevitable discovery doctrine.  *United States v. Martinez*, 512 F.3d 1268, 1273 (10th Cir. 2008) (describing inevitable discovery as "an exception to the exclusionary rule [that] permits evidence to be admitted if an independent, lawful police investigation inevitably would have discovered it.") (quoting *United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir. 2005)).  Therefore, an inevitable discovery analysis will not be applied here.

The United States responds that because Estrada had probable cause to believe the Saturn contained evidence of criminal activity, the Saturn was lawfully seized to obtain a search warrant. (Doc. 31) at 21. The United States also argues that the RPD did not violate its own policy because according to the policy, vehicles may be towed to preserve evidence. *Id.* Finally, the United States contends that Estrada lawfully impounded the Saturn under the community caretaking doctrine. *Id.* The Court finds that based on the information that was available to Estrada, it was reasonable for the Saturn to be towed pending approval of a search warrant.

One type of justification for impoundment of a vehicle is the community caretaking doctrine. *United States v. Hunnicutt*, 135 F.3d 1345, 1351 (10th Cir. 1998). Under the community caretaking doctrine, impounding a vehicle is acceptable to determine if a vehicle has been stolen or abandoned. *See South Dakota v. Opperman*, 428 U.S. 364, 369 (1976). Here, Defendant told Estrada that he did not know who owned the Saturn. Tr. at 30. Estrada testified that even if Defendant had ultimately gotten away during the chase, the Saturn still would have been towed to the Roswell Police Department because the vehicle's engine was on, it was unsecured because the doors were not locked, and Estrada could not find anyone to claim the Saturn at 205 West Tilden. Tr. at 56. Under these circumstances, Estrada testified the Saturn would have been towed to protect it from being burglarized. Tr. at 56. Moreover, Estrada attempted to determine if the vehicle had been stolen, but he did not learn until after both search warrants were executed that Martinez had given Defendant permission to work on the vehicle. *See* Tr. at 53. Consequently, Estrada did not know on January 4, 2018, whether the Saturn was stolen. *Id.* For these reasons, Estrada properly seized and impounded the Saturn under the community caretaking doctrine.

The Court also concludes that Estrada complied with the RPD's policy on towing vehicles. The policy states, "Vehicles abandoned on private property will not be towed unless they are needed for evidentiary purposes involving a criminal offense . . . [or t]he vehicle is needed for evidence processing in a . . . criminal investigation." (Doc. 26-4) at 1. Estrada seized the vehicle and towed it to the RPD pending a judge's approval of the search warrant, which was itself supported by probable cause. The Saturn was clearly "needed for evidentiary purposes involving a criminal offense," specifically burglary. Estrada, therefore, complied with that portion of the RPD's policy.

In addition, Defendant argues that the Saturn was towed and held in violation of the RPD's policy that a vehicle may be held only for 72 hours. (Doc. 26) at 15. According to Estrada, the reason he did not execute the search warrant until January 8, 2015, is that January 5, 2018, was a Friday, "so I spent most of the day typing the search warrant, and at that point I was just waiting for court hours Monday morning, which is the eighth, to get the search warrant signed." Tr. at 43. Although the 72-hour limit was exceeded, the Court concludes that Estrada's delay in executing the search warrant was reasonable under these circumstances and in good faith. *See United States v. Taylor*, 592 F.3d 1104, 1108 (10th Cir. 2010) ("Reasonable police inventory procedures administered in good faith satisfy the Fourth Amendment.") (alteration omitted) (quoting *Colorado v. Bertine*, 479 U.S. 367, 372 (1987)). For these reasons, Estrada's seizure and impoundment of the Saturn pending approval of both the first search warrant and the second, amended search warrant were lawful.

*IV.    Conclusion*

For the foregoing reasons, the Court concludes that Estrada did not act unreasonably under the Fourth Amendment.  Accordingly, the Court **DENIES** Defendant's Motion to Suppress Evidence and Statements (Doc. 26).

**IT IS SO ORDERED.**

_____
UNITED STATES DISTRICT JUDGE